# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHARTER OAK OIL CO., INC. d/b/a AIELLO HOME SERVICES, Plaintiff, | No. 3:17-cv-00689 (SRU) |
| v. | |
| APPLIED UNDERWRITERS, INC., et al., Defendants. | |

## RULING AND ORDER

In this diversity action, the plaintiff, Charter Oak Oil Co., d/b/a Aiello Home Services ("Aiello"), alleges that its workers' compensation insurer, Applied Underwriters, Inc. ("Applied") and its affiliates, are liable for multiple violations of Connecticut insurance, unfair trade practice, and securities laws. The underlying dispute in this case involves a series of insurance and reinsurance contracts between Aiello and the defendants. One of the disputed contracts contains a mandatory forum selection clause requiring the parties to bring all suits in the State of Nebraska. Applied and its co-defendants, which are corporations based in Nebraska, Iowa, and California, have moved to enforce the forum selection clause by dismissing this case or, in the alternative, by transferring it to the agreed forum, the United States District Court for the District of Nebraska. Aiello opposes the motion, arguing that Nebraska law precludes the enforcement of forum selection clauses that impose an unreasonable inconvenience on the plaintiffs.

On August 7, 2017, I held oral argument on the defendants' motion to dismiss or transfer. For the reasons detailed below, that motion is denied.

# I.    Standard of Review

The defendants brought their original motion to dismiss for improper venue under Rule 12(b)(3) of the Federal Rules of Civil Procedure. Def.'s Mot. Dismiss, Doc. No. 13. Rule 12(b)(3) is an inappropriate method to enforce forum selection clauses when the plaintiff's chosen venue otherwise satisfies 28 U.S.C. § 1391. *See Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 134 S. Ct. 568, 578 (2013). The defendants not make any arguments in support of Rule 12(b)(3) dismissal in their brief; they appears to exclusively pursue transfer under 28 U.S.C. § 1404(a) or dismissal under *forum non conveniens* in the alternative. *See* Def.'s Br., Doc. No. 13-1.

A valid forum selection clause may be enforced through transfer to another federal district court under section 1404(a) if the destination forum is another federal district, or by dismissal under *forum non conveniens* if the movant seeks transfer to a state or foreign jurisdiction. *Atl. Marine*, 134 S. Ct. at 579–80. The distinction between *forum non conveniens* dismissal and section 1404(a) transfer is a procedural formality because the two mechanisms share a common doctrinal foundation. *See Atl. Marine*, 134 S. Ct. at 580 ("Section 1404(a) is merely a codification of the doctrine of *forum non conveniens* . . . [it] 'did not change "the relevant factors" which federal courts used to consider under the doctrine of *forum non conveniens*'." (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 37 (1988) (Scalia, J. dissenting))). The legislative intent of section 1404(a), however, strongly weighs against outright dismissal when there is an alternative federal forum to which the case could be transferred. *See Atl. Marine*, 134 S. Ct. at 580 ("[When] the transferee forum is within the federal court system . . . Congress has replaced the traditional remedy of outright dismissal with transfer."); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253–54 (1981) (Congress intended section 1404(a) as a "housekeeping measure" with a "remedial purpose" to allow "easy change of venue within a

unified federal system"); *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955) ("Congress, in writing

[section] 1404(a) . . . was revising as well as codifying. The harshest result of the application of

the old doctrine of forum non conveniens, dismissal of the action, was eliminated by the

provision in [section] 1404(a) for transfer.").

In evaluating motions to dismiss or transfer based on forum selection clauses, a district

court typically relies on pleadings and affidavits from the parties. *Martinez v. Bloomberg LP*,

740 F.3d 211, 216 (2d Cir. 2014) (citing *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir.

2007)). For reasons discussed *infra*, courts applying section 1404(a) generally give "controlling

weight" to any valid forum selection clauses that parties include in a written agreement. *Atl.*

*Marine*, 134 S. Ct. at 579.

## II.     Background

The underlying dispute in this case concerns a novel insurance product known as

"EquityComp" provided by Applied and its affiliates: California Insurance Company ("CIC"),

Applied Risk Services ("ARS"), and Applied Underwriters Captive Risk Assurance Company,

Inc. ("AUCRAC").[1] Applied marketed the EquityComp program to businesses throughout

Connecticut as a workers' compensation insurance plan that would deliver substantial cost

savings to insureds as long as workplace injury claims were minimized. Compl. at ¶ 10, Doc. No.

1-1; Notice of Removal at 8, Ex. C, Doc. No. 1-3. In November 2013, Aiello sought to purchase

workers' compensation insurance through Sinclair Insurance Group, a Connecticut-based broker.

Pl.'s Br. at 3, Doc. No. 16. Applied provided Aiello with a proposal for the EquityComp

---

[1] Applied is a Nebraska company with a principal place of business in Omaha, Nebraska. Compl. at ¶ 2, Doc. No. 1-1. AUCRAC is an Iowa company with a principal place of business in Cedar Rapids, Iowa. *Id.* at ¶ 4. ARS is a Nebraska company with a principal place of business in Omaha, Nebraska. *Id.* at ¶ 6. CIC is a California company with a principal place of business in Omaha, Nebraska. *Id.* at ¶ 8. Of all the defendants, only CIC was authorized by the Connecticut Department of Insurance to issue workers' compensation insurance policies in Connecticut. *Id.* at ¶ 8.

program. *Id.* After reviewing that proposal, Aiello requested that Sinclair issue a binder of

workers' compensation insurance coverage through Applied. *Id.* Michael Jezouit, Aiello's

president, executed a formal binder request November 14, 2013. Notice of Removal at 13, Ex. C,

Doc. No. 1-3. In that binder request, Jezouit acknowledged that the issuance of insurance by

Applied or its affiliates was contingent on Aiello's execution of a supplemental "Reinsurance

Participation Agreement" ("RPA"). *Id.* Jezouit executed the RPA with AUCRAC on November

14, 2013. Def.'s Mot. Dismiss at 5, Ex. B, Doc. No. 13-4 (hereinafter "RPA Contract"). CIC

issued its first workers' compensation policy to Aiello on November 15, 2013. Notice of

Removal at 2, Ex. D, Doc. No. 1-4.

Applied structured the EquityComp program as a traditional workers' compensation

policy coupled with a reinsurance facility in which the policyholder was required to participate.

Notice of Removal at 8, Ex. C, Doc. No. 1-3. Aiello's traditional workers' compensation policy

was written by CIC, who was the only Applied affiliate that was licensed to sell and issue

insurance policies in the State of Connecticut. RPA Contract at 4, Doc. No. 13-4; *see also*

discussion *supra* note 1. AUCRAC, the administrator of the reinsurance facility, entered into a

treaty with CIC to reinsure losses under Aiello's workers' compensation policy. RPA Contract at

4, Doc. No. 13-4. AUCRAC, through the RPA, simultaneously entered into an agreement with

Aiello that obligated Aiello to provide funding for a "segregated protected cell" within

AUCRAC's reinsurance facility. *Id.*

The network of agreements had the practical effect of making Aiello act as its own

reinsurer. Unlike traditional reinsurance mechanisms, the funds in Aiello's segregated cell were

not pooled with those of similar cells funded by other EquityComp policyholders. *Id.* Aiello's

basic obligation under the RPA was to apply the funds from its segregated cell toward the losses

accrued under its own CIC workers' compensation policy, up to 128% of a predetermined annual "Loss Pick Containment Amount."[2] *Id.* at 9. There were three primary ways in which the segregated cell would be funded. First, Aiello was responsible for maintaining "capital deposits" in the cell equal to 10% of the Loss Pick Containment Amount. *Id.* Second, AUCRAC would help fund the segregated cell by periodically allocating a partial refund of "excess" premiums[3] paid by Aiello to CIC; that amount was calculated quarterly according to a complex formula in which the total collected premiums were adjusted by factors that reflected Aiello's loss activity.[4] *Id.* at 9–10. Finally, if Aiello's capital deposits and AUCRAC's premium allocations were insufficient to cover the policy's aggregate losses (up to the 128% threshold), Aiello was responsible for providing additional capital deposits into the segregated cell to make up the difference. *Id.* The RPA designated ARS as the "billing agent" with responsibility for "tru[ing] up" any amounts owed among the parties. *Id.* at 5. Applied acted as the overall administrator of the EquityComp program, issuing monthly statements that documented Aiello's current policy costs and the estimated total costs to be incurred at the end of the three-year program. Compl. at ¶ 27, Doc. No. 1-1.

Aiello enrolled in the EquityComp program for a three-year term. Notice of Removal at 13, Ex. C, Doc. No. 1-3. During that period, CIC issued three one-year insurance policies; Aiello

---

[2] For example, the first year estimated Loss Pick Containment Amount calculated by AUCRAC was $422,699. RPA Contract at 12, Doc. No. 13-4. Therefore, Aiello would have been directly responsible for maintaining sufficient funds in its segregated cell to satisfy claims against its own workers' compensation policy up to 128% of that amount — approximately $541,054. *See id.* at 9.

[3] Applied marketed the refund mechanism as a "profit sharing program" that provided an opportunity for the policyholder to achieve substantial cost savings over traditional workers' compensation insurance premiums, as long as the policyholder had few claims. *See* Notice of Removal at 10–12, Ex. C, Doc. No. 1-3.

[4] One of the adjustment factors was a "Loss Development Factor" ("LDF") that fluctuated according to the age of the claim. *See* RPA Contract at 11, Doc. No. 13-4. In general, a higher LDF was assigned to claims that had been recently opened. *See id.* Claims with high LDFs would result in a higher "Exposure Group Adjustment Factor," which would ultimately reduce the premium refund into Aiello's segregated cell, requiring Aiello to make additional capital deposits to meet its RPA obligations. *See id.* at 9–10.

renewed its coverage on November 15, 2014 and November 15, 2015. Jezouit Aff. at ¶¶ 7–8, Doc. No. 16-1. During its three years of participation in EquityComp, Aiello paid all premiums due through a monthly electronic funds transfer from its Connecticut bank account. *Id.* at ¶ 10. For the first two years, Aiello appears to have had no disputes regarding its premium payment obligations under the EquityComp program. *See* Compl. at ¶¶ 25–31, Doc. No. 1-1. In April 2016, Aiello received a statement from Applied assessing an additional premium charge of $195,786.52, and reporting total estimated costs nearly $200,000 higher than the previous month's total cost estimate. *Id.* at ¶ 32. Aiello was "shocked" by the additional premium charge and questioned the increased premium through its insurance advisor. *Id.* at ¶ 34. Applied responded that the extra premium charge was due to the application of a LDF[5] to a previously closed claim that had been reopened. The LDF used by Applied was allegedly higher than any figure that Aiello had contemplated, because it did not appear in any of the EquityComp quote materials. *Id.* at ¶ 35. Aiello attempted to cancel its policy, but Applied informed the company that there would be financial penalties for early cancellation. *Id.* at ¶¶ 37–38. Aiello decided to complete the policy term and made arrangements with Applied to pay the outstanding premium balance via an installment plan. *Id.* at ¶ 40–41. To implement the payment plan, Applied offered Aiello a promissory note for $54,886.52, which Aiello executed. *Id.* at ¶ 41.

Aiello did not renew its EquityComp coverage following the expiration of the three-year term on November 15, 2016. Jezouit Aff. at ¶ 15, Doc. No. 16-1. In December 2016, Aiello received a statement from Applied demanding $264,277 in unpaid premiums. *Id.* On December 15, 2016, Applied attempted to electronically transfer funds from Aiello's bank account in the amount of $264,677.38. *Id.* at ¶ 16; Compl. at ¶ 50, Doc. No. 1-1. Aiello placed a hold on its

---

[5] *See* discussion *supra* note 4 for a discussion of LDFs and their role in the RPA segregated cell formula.

bank account to prevent the transfer of the disputed funds. Jezouit Aff. at ¶ 16, Doc. No. 16-1. In

January 2017, Aiello received a letter from Applied claiming that Aiello owed an additional

$268,646.38 in unpaid premiums. *Id.* at ¶ 17. Applied sent another letter in February 2017

demanding that Aiello pay $236,352.71. *Id.* at ¶ 20. That amount was less than Applied

demanded in its January 2017 letter, and both the January and February letters sought a different

amount than Applied attempted to electronically transfer in December 2016. *Id.* With each letter,

Applied attached EquityComp statements that explained that the past-due amount under the

"Worker's Compensation Program" was calculated "based upon [Aiello's] actual claims

applying run-off Loss Development Factors (LDF's) and an additional capital deposit of

$48,000." *See*, *e.g.*, Pl.'s Br. at 4, Ex. D, Doc. No. 16-5.

On March 28, 2017, Aiello filed suit in Connecticut Superior Court, Judicial District of

Hartford, alleging that Applied and its affiliates violated the Connecticut Unfair Insurance

Practices Act (CUIPA), Conn. Gen. Stat § 38a-816, the Connecticut Unfair Trade Practices Act

(CUTPA), Conn. Gen. Stat. § 42-110g, and the Connecticut Uniform Securities Act, Conn. Gen.

Stat. § 36b-29. *See* Compl. at ¶¶ 65–93, Doc. No. 1-1. Aiello also sought a declaratory judgment

that the unpaid premiums and capital deposit demanded by Applied were not based upon any

premium calculation factors on file with the Connecticut Department of Insurance, and the

disputed premiums were therefore unenforceable under Connecticut law. *Id.* at ¶¶ 55–64.

Applied and its affiliates filed a Notice of Removal with this court pursuant to 28 U.S.C. §§

1332, 1441, and 1446. Notice of Removal at 1, Doc. No. 1. This motion to dismiss followed.

The RPA Contract contains a choice-of-law provision specifying that the agreement is to

be construed exclusively under the laws of Nebraska:

> This Agreement shall be governed by and construed in accordance with the
> internal laws of the State of Nebraska without giving effect to any choice or

> conflict of law provision . . . that would cause the application of Laws of
> any jurisdiction other than those of the State of Nebraska.

RPA Contract at 6, Doc. No. 13-4. The agreement also contained a forum selection clause that

was one of only two clauses in the agreement printed in capital letters:

> ANY LEGAL SUIT, ACTION, OR PROCEEDING ARISING OUT OF,
> RELATED TO OR BASED UPON THIS AGREEMENT, OR THE
> TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MUST
> ONLY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED
> STATES OF AMERICA OR THE COURTS OF THE STATE OF
> NEBRASKA, IN EACH CASE LOCATED IN OMAHA AND THE
> COUNTY OF DOUGLAS, AND EACH PARTY IRREVOCABLY
> SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS
> IN ANY SUCH SUIT, ACTION, OR PROCEEDING. . . . THE PARTIES
> IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY
> OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION,
> OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY
> WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH
> COURT THAT ANY SUCH SUIT, ACTION, OR PROCEEDING
> BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN
> INCONVENIENT FORUM.

*Id.* at 6–7. The CIC workers' compensation insurance policy did not contain any similar forum

selection clause. Applied filed the current motion in an attempt to enforce that forum selection

clause by dismissing Aiello's case, or in the alternate, transferring it to the United States District

Court for the District of Nebraska. Def.'s Br. at 1, Doc. No. 13-1.


III.     **Discussion**

When deciding a typical section 1404(a) or *forum non conveniens* motion not involving a

forum-selection clause, a district court must evaluate both the private interests of the parties and

various public-interest considerations to determine whether the transfer or dismissal is warranted.

*Atl. Marine*, 134 S. Ct. at 581.

> Factors relating to the parties' private interests include "relative ease of
> access to sources of proof; availability of compulsory process for attendance
> of unwilling, and the cost of obtaining attendance of willing, witnesses . . .
> and all other practical problems that make trial of a case easy, expeditious

and inexpensive." . . . Public-interest factors may include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law."

*Id.* at 581 n.6 (quoting *Piper*, 454 U.S. at 241 n.6). Courts also consider the plaintiff's choice of forum. *Id.* (citing *Norwood*, 349 U.S. at 32). The presence of a valid forum selection clause requires the court to adjust its section 1404(a) analysis by: (1) disregarding the plaintiff's choice of forum; (2) ignoring arguments about the parties' private interests; and (3) following the choice-of-law provisions of the *transferee* state, rather than the original forum state as is usually the case when a district court sits in diversity. *Atl. Marine*, 134 S. Ct. at 581–82. Thus, courts give a valid forum selection clause "controlling weight in all but the most exceptional cases." *Id.* at 581 (quoting *Stewart*, 487 U.S. at 33 (Kennedy, J., concurring)); *see also* Def.'s Br. at 4, Doc. No. 13-1.

To determine whether a forum selection clause is enforceable, the court must evaluate: (i) whether the clause was reasonably communicated to the party resisting enforcement; (ii) whether the clause is mandatory or permissive; (iii) whether the claims and parties involved in the suit are subject to the forum selection clause; and (iv) assuming that the preceding factors have been satisfied, whether the resisting party can overcome the resultant presumption of enforceability by "making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Martinez*, 740 F.3d at 217 (citing *Phillips*, 494 F.3d at 383); *accord M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972). "The overriding framework governing the effect of forum selection clauses in federal courts . . . is drawn from federal law. . . . In answering the *interpretive* questions posed by parts two and three of the four-part framework, . . . we normally apply the body of law selected in an

otherwise valid choice-of-law clause." *Martinez*, 740 F.3d at 217–18. Thus, Nebraska law is applicable to this court's analysis of the second and third prongs of the *Martinez* framework.

Before addressing the enforceability of the forum selection clause, however, it is necessary to determine whether the scope of the clause encompasses the claims brought in the instant case. Therefore, to determine whether the defendants' motion to dismiss is warranted, we must evaluate: (1) which parties are contractually bound by the RPA forum selection clause; (2) whether Aiello's statutory claims arise out of the RPA contract such that the forum selection clause is invoked; and (3) whether the forum selection clause is enforceable under Nebraska law.

A. Parties bound by the RPA forum selection clause

The forum selection clause is inapplicable to the bulk of the claims, because it only appears in the RPA contract between Aiello and AUCRAC — nowhere is there any indication of a forum selection clause in the contracts executed between Aiello and Applied, CIC or ARS.[6] Thus, Aiello is free to litigate its claims against the remaining defendants without regard to any forum agreement that it reached with AUCRAC. At the motion hearing, Applied argued that the named defendants should be considered as a single entity for the purposes of applying the forum selection clause. Applied could point to no authority for that proposition. Therefore, as a matter of law, the clause only applies to Aiello and AUCRAC, the parties bound to the RPA.

---

[6] The defendants argue in their reply brief that the promissory note executed by Aiello contained an additional forum selection clause that bound Aiello to Nebraska in all disputes with Applied (not just AUCRAC). *See* Def.'s Reply Br. at 7–8, Doc. No. 18. That is of no consequence for two reasons. First, the promissory note does not appear anywhere in the record. Insofar as this is the defendants' motion, they have the burden to produce relevant evidence supporting the existence of forum clause agreements between Aiello and the named defendants. Second, assuming *arguendo* that the promissory note contains forum clause language similar to that found in the RPA contract, there is no indication that any breach occurred with respect to either parties' obligations under that note. Rather, Aiello alleges that the note itself was an illegal security under Connecticut law. *See* Compl. at ¶¶ 85–87, Doc. No. 1-1. For reasons set forth later in this opinion, those claims are outside the scope of any forum selection clause that the promissory note may have contained.

B.  Scope of the forum selection clause

The fact that AUCRAC and Aiello are bound to the RPA's forum selection clause does not mean that all disputes between those parties are subject to the clause. Rather, if the rights asserted in a claim originate in a statute, not a contractual provision, then that claim may be outside the scope of any forum selection clause within the contract. *See Phillips*, 494 F.3d at 390 (holding that recording contract forum clause did not apply to Copyright Act and state unfair trade practice claims because those statutes conferred rights independent of the contract); *see also Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679, 682 (2d Cir. 1993) ("[W]here a plaintiff . . . asserts no rights under a contract with the defendant containing a forum-selection clause, the forum-selection clause has no effect." (citing *Cheever v. Acad. Chi. Ltd.*, 685 F. Supp. 914, 917 (S.D.N.Y. 1988))).

In the instant case, the bulk of Aiello's claims are allegations of illegal conduct during the formation of the contractual relationship between Applied and Aiello. Rather than claiming a breach of contract, Aiello alleges that Applied and its affiliates engaged in a range of misleading and deceptive conduct during the insurance procurement process, in violation of Connecticut law.[7] *See* Compl. at ¶¶ 65-83, Doc. No. 1-1 (alleging that, *inter alia*, Applied misrepresented the estimated costs of EquityComp prior to policy issuance, failed to disclose the actual premium calculation factors in its quote materials, and engaged in the sale of illegal securities). Thus, similar to the Copyright Act claims at issue in *Phillips*, Connecticut law, not the RPA contract, provides the basis for the rights Aiello asserted in its action. *See also Phillips*, 494 F.3d at 392

---

[7] Some of the elements of Aiello's complaint allege conduct that took place during the performance of the contract. *See, e.g.*, Compl. at ¶ 67e (alleging that Applied provided misleading cost estimates throughout the course of the insurance policy). Those claims can be considered a part of Applied's pre-contractual misrepresentations insofar as Aiello alleges that Applied provided the false estimates in furtherance of its initial misrepresentations that induced the formation of the contract.

("[S]tate law [unfair trade practice] claims do not originate from the recording contract and are exempt from operation of the forum selection clause.").

The defendants rely on the RPA contract as a defense to Aiello's claims, arguing that the rights and obligations in dispute are governed by the RPA. *See* Def.'s Br. at 7, Doc. No. 13-1. Additionally, AUCRAC brought an action in Nebraska federal court alleging that Aiello breached its obligations under the RPA by not paying the demanded premiums. Neb. Compl. at 2, Doc. No. 13-4. Although the provisions of the RPA contract may be relevant as a defense to Aiello's claims against AUCRAC, that is not sufficient to draw a relationship between a contractually-mandated forum selection clause and statutory claims not dependent on that contract.[8] *See Phillips*, 494 F.3d at 392 ("The only nexus between the proceedings and the contract arises when the defendants raise their defenses. Given this sequence of events, one cannot say that the origins of the proceedings were in the . . . contract."). Thus, the scope of the forum selection clause does not reach the claims brought in the instant case.

### C. Enforceability of the forum selection clause

Even if the forum selection clause did apply to Aiello's claim, it would not be enforceable under Nebraska law. The RPA contains a choice-of-law provision that states the

---

[8] Aiello's claims are so unrelated to the underlying RPA contract that they would not even be considered compulsory counterclaims against an action for breach of that contract. *See Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir. 2004) (quoting *United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir. 1979)) (when debtors brought suit against creditors alleging violations of federal anti-discrimination laws, the defendant's counterclaim seeking to recoup the underlying debt bore no "logical relationship" to the discrimination claims, because the plaintiff's claims alleged discriminatory conduct during the formation of the contract, and the defendant's counterclaim concerned private debts owed under the contract itself); *Betsey v. Nissan Motor Acceptance Corp.*, 2009 WL 2925367, at *2 (D. Conn. Sep. 10, 2009) ("Defendant's counterclaim for payment of an overdue debt is distinct from, and not logically related to a plaintiff's claim based on improper credit reporting practices under the FCRA."); *Leatherwood v. Universal Bus. Serv. Co.*, 115 F.R.D. 48, 49 (W.D.N.Y. 1987) (creditor's counterclaim for underlying debt in action brought by debtor alleging violations of Fair Debt Collection Practices Act was not compulsory because counterclaim arose out of private duty under state law, whereas plaintiff's original claim arose out of debt collector's obligations under federal law). Aiello's cause of action alleges that Applied and its affiliates breached their duties under state law. Under *Jones* and related cases, those duties are distinct from and not logically related to any private contractual duties between the parties.

agreement "shall be governed by and construed in accordance with the internal laws of the State of Nebraska." RPA Contract at 6, Doc. No. 13-4. Under the previously discussed *Martinez* framework, courts look to the body of law chosen by the parties in a choice-of-law clause when evaluating the enforceability of forum selection clauses. *See Martinez*, 740 F.3d at 217–18. Therefore, contra the defendants' argument that federal law provides the exclusive analytical framework for evaluating the enforceability of the forum selection clause, *see* Def.'s Reply Br. at 2–3, Doc. No. 18, it is necessary to look to Nebraska law to determine whether the clause is valid and enforceable.

1. *Nebraska law looks to the convenience of the parties to determine the validity of forum selection clauses*

Notwithstanding *Atlantic Marine* and related cases discussed previously, Nebraska law requires a court to assess the convenience of the party resisting a forum selection clause if the agreement is the sole basis of Nebraska's jurisdiction, regardless of any previous written agreements between the parties. Nebraska has adopted the Model Uniform Choice of Forum Act, which provides that:

> If the parties have agreed in writing that an action on a controversy may be brought in this state and the agreement provides the *only* basis for the exercise of jurisdiction, a court of this state will entertain the action if . . . this state is a *reasonably convenient* place for the trial of the action . . . .

Neb. Rev. Stat. § 25-414 (1969) (emphasis added). "The law of [Nebraska] is an inherent part of every contract . . . and every law affecting the contract is read into it and becomes a part thereof." *Woodmen of World Life Ins. Soc. v. Puccio*, 1 Neb. App. 478, 482 (1993), *overruled on other grounds by Woodmen of World Life Ins. Soc. v. Yelich*, 250 Neb. 345 (1996). Therefore, section 25-414 of the Choice of Forum Act is read into the RPA contract between AUCRAC and Aiello. *See* Pl.'s Br. at 7–8, Doc. No. 16.  Section 25-414 only applies when a Nebraska court

would have no jurisdiction but for the forum selection clause identifying Nebraska as the agreed forum. *Polk Cty. Recreational Ass'n v. Susquehanna Patriot Commercial Leasing Co.*, 273 Neb. 1026, 1033 (2007); *Ameritas Inv. Corp. v. McKinney*, 269 Neb. 564, 572 (2005). Therefore, before applying section 25-414, it is necessary to analyze whether Nebraska would have jurisdiction if Aiello had not consented to the forum selection clause.[9] *See Woodmen of World Life Ins. Soc. v. Walker*, 1 Neb. App. 882, 889 (1993) (declining to apply section 25-414 where Nebraska had an independent basis for personal jurisdiction other than forum selection clause).

2. *The forum selection clause is the only basis for bringing the action in Nebraska.*

To determine whether a Nebraska court can exercise personal jurisdiction over a nonresident,[10] the court must look to the state's long-arm statute. *Brunkhardt v. Mountain W. Farm Bureau Mut. Ins. Co.*, 269 Neb. 222, 225 (2005). If the long-arm statute permits the exercise of personal jurisdiction over the nonresident party, the court must then determine whether exercising jurisdiction would be proper under the U.S. Constitution. *Id.* Nebraska's long-arm statute extends jurisdiction over any nonresident "[w]ho has any . . . contact with or maintains any . . . relation to [Nebraska] to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States." Neb. Rev. Stat. § 25-536 (1983). Therefore, Nebraska will have specific personal jurisdiction over a nonresident so long as the

---

[9] In cases where a party seeks enforcement of a forum selection clause, Nebraska courts generally assume that clause is the only basis for bringing the action in Nebraska. *See Ameritas,* 269 Neb. at 573 ("[W]here a choice of forum clause is a necessary component of the court's exercise of personal jurisdiction, it is clear that 'the court would have no jurisdiction but for the fact that the parties have consented to its exercise by the choice-of-forum agreement.'" (quoting HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS, MODEL CHOICE OF FORUM ACT § 2, cmt. at 220 (1968))). Notwithstanding the analytical shortcuts permitted by *Ameritas,* Nebraska courts analyze the quality and nature of contacts between a nonresident party and Nebraska as a threshold question before applying section 25-414. *See, e.g.*, *Walker*, 1 Neb. App. at 889–90.

[10] Although Aiello is the plaintiff in this action, it is also the party resisting Nebraska jurisdiction. Therefore, under the hypothetical jurisdictional analysis required by section 25-414, Aiello is in a role traditionally played by defendants in jurisdictional disputes, because Aiello has not consented to jurisdiction in Nebraska.

exercise of jurisdiction comports with federal principles of due process. *See Brunkhardt*, 269 Neb. at 225.

For a court's exercise of personal jurisdiction to comport with due process principles, the nonresident must have sufficient "minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In the Eighth Circuit, courts consider five factors in their basic minimum contacts analysis:

> (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

*Land-O-Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.2d 1338, 1340 (8th Cir. 1983) (quoting *Aaron Ferer & Sons Co. v. Diversified Metals Corp.*, 564 F.2d 1211, 1215 (8th Cir. 1977)). The defendants correctly argue that, under the *Land-O-Nod* framework, the convenience of the parties is of "secondary importance and not determinative." *See* Def.'s Reply Br. at 5, Doc. No. 18 (quoting *Land-O-Nod*, 708 F.2d at 1340). However, that framework is not intended to be "a slide rule by which fundamental fairness can be ascertained with mathematical precision" — ultimately the central focus of the inquiry is "the relationship among the defendant, the forum, and the litigation." *Land-O-Nod*, 708 F.2d at 1340 (internal quotation marks omitted) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). Before a state may exercise jurisdiction, a nonresident must take some act by which it "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

The defendants argue that their agreements with Aiello established Aiello's minimum contacts with Nebraska because Aiello had a "clear expectation of substantial future contacts with Nebraska, in order to administer their workers compensation claims and resolve billing issues." Def.'s Reply Br. at 7, Doc. No. 18. The defendants cite *Burger King Corp* as an analogous case where a person who voluntarily accepted a contract with a Florida-based company was subject to personal jurisdiction in Florida. *Id.* The current case, however, is distinguishable from the contractual business relationship at issue in *Burger King*, because there is a clear distinction between conventional commercial contracts and those that arise in the business of insurance. *See McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223–24 (1957) (holding that states have a "manifest interest in providing effective means of redress for [their] residents" in disputes with insurers, so individual policyholders should not have to bring actions in foreign forums); *Gray v. Lewis & Clark Expeditions, Inc.*, 12 F. Supp. 2d 993, 998 (D. Neb. 1998) (holding insurance contracts are "special cases where the state has an exceptional interest" unlike standard commercial contracts (internal quotation marks omitted) (quoting *Gendler v. Gendler Growth Properties*, 461 F. Supp. 434, 437 n.2 (D. Neb. 1978))).

The defendant in *Burger King* was an entrepreneur who had entered into a franchise agreement with Florida-based Burger King Corporation to operate Burger King fast food restaurants in Michigan. *Burger King*, 471 U.S. at 464–67. The franchise agreement was a "carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida." *Id.* at 479–80. In evaluating the quality and nature of the defendant's contacts with Florida, the Court held that factors including the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . must be evaluated in determining whether the defendant

purposefully established minimum contacts within the forum." *Id.* The Court concluded that the long term nature of the agreement, as well as the substance of the agreement itself, indicated that the franchisee purposefully availed himself of the benefits and protections of Florida laws. *Id.*

*Burger King* is a useful case for analyzing jurisdictional issues that arise under general business contracts, but Allied's and its affiliates' argument fails to account for the well-established law that governs the special circumstances of insurance contracts. *See McGee*, 355 U.S. at 223–24. An insurance company that markets and sells policies to residents of a given state establishes minimum contacts with that state. *Id.*; *accord Travelers Health Ass'n v. Virginia ex rel. State Corp. Comm'n*, 339 U.S. 643, 648 (1950). Minimum contacts, however, are *not* established reciprocally – due process would be violated if policyholders had to travel to their insurers' home states to seek legal redress. *See McGee*, 355 U.S. at 223 ("[Insureds] would be at a severe disadvantage if they were forced to follow the insurance company to a distant State in order to hold it legally accountable."); *Travelers*, 339 U.S. at 649 (affirming prior Supreme Court decisions that "referred to the unwisdom, unfairness and injustice of permitting policy holders to seek redress only in some distant state where the insurer is incorporated"). Thus, in the context of insurance contracts, the law imputes the *absence* of a relationship between insurance policyholders and the home states of their insurers.

*Burger King* did not abrogate the pro-policyholder philosophy underlying *McGee*. *See Burger King*, 471 U.S. at 478 (quoting *McGee*, 355 U.S. at 223–24) ("[J]urisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent."). The *Burger King* Court further acknowledged that a contract with an out-of-state party *alone* is generally not sufficient to establish minimum contacts. *Id.* at 478. Courts in Nebraska and within the Eighth

Circuit have affirmed principles outlined in *McGee* by distinguishing insurance policies from *Burger King*-style commercial contracts. *See, e.g.*, *Unimerica Ins. Co. v. GA Food Servs., Inc.*, 2014 WL 12617469, at *3 (D. Minn. May 27, 2014) (citing *Bell Paper Box, Inc. v. Trans W. Polymers, Inc.*, 53 F.3d 920, 923 (8th Cir. 1995)) (holding that contacts between Minnesota and out-of-state insurance policyholder, including sending information and premium payments to insurer, were not of the "quantity or nature necessary [for Minnesota] to establish specific personal jurisdiction"); *Applied Underwriters, Inc. v. Dinyari, Inc.*, 2008 WL 2231114, at *6 (Neb. Ct. App. May 20, 2008) (workers' compensation insurance policies did not establish minimum contacts between policyholders and Nebraska where the policies were purchased from California brokers, premiums were paid from a California bank account, and covered employees located exclusively in California); *Applied Underwriters, Inc. v. Emp'r Outsource Serv., Inc.*, 2007 WL 1470454, at *5 (Neb. Ct. App. May 22, 2007) (Illinois policyholder who executed a payment plan promissory note with Nebraska insurer did not establish minimum contacts with Nebraska because he could not reasonably anticipate being haled into Nebraska court as a future consequence).

The facts of the instant case are analogous in key ways to *Dinyari* and *Employer Outsource Services*, two cases in which Nebraska courts considered similar agreements between Applied and nonresident policyholders. In *Dinyari*, a California-based policyholder accepted a workers' compensation insurance policy written by Applied. *Dinyari*, 2008 WL 2231114 at *1. The policyholder conducted its business exclusively in California, had no employees or office space in Nebraska, and did not purchase insurance for any person, property, or risk within Nebraska. *Id.* at *6. The policyholder purchased its policy through a California based broker, and paid premiums through its California bank account. *Id.* A Nebraska court held that the

policyholder's interactions with Applied's Nebraska-based personnel, including sending payroll information to Applied's Nebraska headquarters, were insufficient to establish minimum contacts with Nebraska. *Id.* In *Employer Outsource Services*, an Illinois-based policy holder executed a promissory note with Applied in order to satisfy a payment plan for unexpected premium increases. *Emp'r Outsource Servs.*, 2007 WL 1470454 at *1. That policyholder also conducted no business in Nebraska, had never traveled to Nebraska, and did not insure any risks in Nebraska under the policy written by Applied. *Id.* at *2. Similar to *Dinyari*, the Nebraska court held that the mere execution of a promissory note was insufficient to establish minimum contacts with Nebraska. *Id.* at *5.

The fact that some courts within the Eighth Circuit have come to opposite conclusions in cases with similar facts does not impact the analysis of the current case. *See, e.g., Applied Underwriters, Inc. v. A&I Steel Fabricators, Inc.*, 2013 WL 12123891, at *4 (D. Neb. May 8, 2013) (finding insurance contract with Nebraska choice-of-law clause created a business relationship analogous to *Burger King*, therefore the insured had established minimum contacts with Nebraska); *Aviva Life & Annuity Co. v. Goldstein*, 722 F. Supp. 2d 1067, 1074 (S.D. Iowa 2010) (finding that life insurance policyholder "established a long-term, on-going contractual relationship" with insurer supporting a "reasonable expectation that . . . he might be haled into court in Iowa in the event of a dispute"). Those cases placed heavy reliance on *Burger King*, which, for reasons outlined in *McGee*, is not appropriate in the insurance context.

In the current case, Aiello conducts business exclusively in Connecticut, and does not employ any individuals in Nebraska. Jezouit Aff. at ¶ 4, Doc. No. 16-1. Similar to *Dinyari*, the scope of Aiello's insurance policy was limited to coverage of risks in Connecticut, and premiums were paid out of Aiello's Connecticut bank account. *Id.* at ¶¶ 9–10. Aiello used a Connecticut-

based broker to procure the insurance policy from Applied. *Id.* at ¶ 11. No employee or representative of Aiello traveled to Nebraska at any time during the policy negotiation process. *Id.* at ¶ 13. Like the policyholder in *Employer Outsource Services*, Aiello executed a single promissory note to preserve its coverage under its original workers' compensation policy. Compl. at ¶ 41, Doc. No. 1-1. Aiello's facts are therefore very similar to *Dinyari* and *Employer Outsource Services*, where Nebraska courts found that the policyholders did not establish minimum contacts with Nebraska.

The defendants argue that *A&I Steel Fabricators* is analogous because Aiello deliberately targeted Nebraska in its interactions with Applied by submitting payments, claims, and payroll information to Applied's Nebraska-based representatives. Def.'s Reply Br. at 6, Doc. No. 18. Those arguments are unpersuasive because, even without considering *McGee* and related cases, the weight of authority indicates that those interactions were "fortuitous" connections to Nebraska, because they arose only out of Applied's unilateral decision to locate its headquarters and employees there. *See Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) ("[The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." (alteration in original) (internal quotation marks omitted) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984))); *id.* at 1123 ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." (quoting *Burger King*, 471 U.S. at 475)). Because Aiello's only contacts with Nebraska occurred via its status as an insured who submitted payments to a company that resided in the state, Aiello would not have been subject to personal

jurisdiction in Nebraska if there had been no forum selection clause in the RPA contract.

Accordingly, the forum selection clause will only be enforced if Nebraska is a reasonably convenient forum for the action under Neb. Rev. Stat. § 25-414.

3. *Nebraska is not a convenient forum for Aiello to pursue its action.*

Under section 25-414, if Nebraska is not a "reasonably convenient" forum for a non-resident party, then a Nebraska court will not enforce the forum selection clause. *Puccio*, 1 Neb. App. at 482. Nebraska courts do not consider a party to be in breach of a forum selection clause that binds it to an inconvenient forum – such a clause would be effectively nullified by a judicial finding of inconvenience. *See id.* ("Puccio breached the venue clause of his contract with the Society only if Nebraska is a reasonably convenient place for Puccio to bring his action"). Therefore, a forum selection clause that fails to meet the requirements of section 25-414 would also fail the third prong of the *Martinez* test for enforceability of forum selection clauses, because that prong requires that a party be "subject to" a forum selection clause before that clause becomes enforceable. *See Martinez*, 740 F.3d at 217.

In the current case, the facts of Aiello's case weigh against finding Nebraska to be a reasonably convenient forum for his action. Whether Nebraska is a "reasonably convenient" forum for the non-resident party is a question of law requiring the court to evaluate the undisputed facts from the pleadings. *Puccio*, 1 Neb. App. at 482. The inquiry of reasonable convenience under section 25-414 is not limited to the literal convenience of the nonresident party. Instead, Nebraska courts apply standard *forum non conveniens* analysis:

> The trial court should consider practical factors that make trial of the case easy, expeditious, and inexpensive, such as the relative ease of access to sources of proof, the cost of obtaining attendance of witnesses through compulsory process. . . . It is also appropriate to consider the advantages of having trial in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle the

21

problems in conflict of laws, and in law foreign to itself.

*Ameritas,* 269 Neb. at 574; *accord Piper*, 454 U.S. at 241 n.6. The *Ameritas* court considered an alleged breach of an employment contract by a Virginia employee of a Nebraska-based financial services company. *Id.* at 566–67. The court, applying section 25-414, determined that Nebraska was a reasonably convenient forum for the Virginia-based defendant, because the business records regarding the contract were located in Nebraska, and the plaintiff brought the action under Nebraska contract law, so there was no mismatch between the forum and the law governing the underlying action. *Id.* at 575.

As previously discussed, *McGee* and related cases impute substantial inconvenience to policyholder plaintiffs in insurance disputes. *See McGee*, 355 U.S. at 223. Even without considering *McGee*, the *Ameritas* factors weigh in Aiello's favor in the instant case. As a practical matter, Aiello is a significantly smaller business than Applied, and is much less able to bear the costs of litigation in a distant state. *See* Compl. at ¶ 36, Doc. No. 1-1 (unexpectedly high workers' compensation insurance premiums threatened solvency of Aiello's business). Both sides point to witnesses and documents that would be more convenient to access in their respective states. *See* Pl.'s Br. at 9–10, Doc. No. 16; Def.'s Reply Br. at 5, Doc. No. 18. It is therefore reasonable to accept Applied's and its affiliates' argument that the balance of convenience factors with respect to the location of documents and witnesses is "flat." *See* Def.'s Reply Br. at 5, Doc. No. 18. Aside from matters regarding the private convenience of the parties, *Ameritas* requires the court to evaluate whether the forum would be "at home" with the substantive law governing the case. *See Ameritas*, 269 Neb. at 574. This factor weighs strongly in Aiello's favor. Aiello brought its action exclusively under Connecticut law. *See* Compl. at ¶¶ 55-93, Doc. No. 1-1. Unlike the plaintiff in *Ameritas*, Aiello has not alleged any claims under

Nebraska law. *See id.* Although the RPA's choice-of-law provision states that one must interpret the contract using Nebraska law, there is no analogous choice-of-law provision regarding disputes arising out of the parties' relationship. Thus, Aiello's claims, brought under various Connecticut statutes, will require application of Connecticut law. A court applying the *Ameritas* analytical framework would therefore find that it is not reasonably convenient for a Nebraska court to try a case governed by the laws of a foreign state, because Connecticut courts are in the best position to apply Connecticut law. *See Ameritas*, 296 Neb. at 574. As previously discussed, a finding of inconvenience at this stage of the analysis renders the forum selection clause invalid under section 25-414; therefore, the clause is not enforceable under the third prong of the *Martinez* framework, and transfer is unwarranted.

4. *The interest of justice requires Aiello's case to remain in Connecticut.*

Even if this court were to resolve all of the preceding arguments in the defendants' favor, the resulting circumstances would be so extraordinary that the interest of justice would compel non-enforcement of the forum selection clause. As discussed previously, the fourth factor of the *Martinez* framework permits courts to deny enforcement of a forum clause when there is "a sufficiently strong showing that enforcement would be unreasonable or unjust." *Martinez*, 740 F.3d at 217. In this case, the forum clause only applies to the RPA agreement between Aiello and AUCRAC. Thus, if the motion is granted, Aiello would be required to pursue its claims against AUCRAC in Nebraska, while litigating the remaining claims against Applied, CIC, and ARS in Connecticut. Because the courts in both jurisdictions would be applying the same body of Connecticut law to the same set of factual circumstances, those circumstances would create a risk of inconsistent judgments. This is undoubtedly the type of unique situation contemplated by

the *Atlantic Marine* court when it explained that enforcement of a forum selection clause may be denied in "exceptional cases." *See Atl. Marine*, 134 S. Ct. at 581.


**IV.     Conclusion**

For the foregoing reasons, the defendants' motion to transfer is denied and the case is ordered to remain before this court in the District of Connecticut.

So ordered.

Dated at Bridgeport, Connecticut, this 12th day of September 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge